UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BLACK STALLION ENTERPRISES                    CIVIL ACTION

VERSUS                                        NO. 09-4504

BAY & OCEAN MARINE, L.L.C., ET AL             SECTION "C" (1)

<u>OPINION</u>

This matter was tried before the Court without a jury on May 23, 2011, and

taken under advisement.  Having considered the evidence, the record and the

memoranda of counsel, the Court issues its opinion in favor of the plaintiff, Black

Stallion Enterprises ("Black Stallion"), for the following reasons.

Black Stallion filed its complaint in admiralty seeking recovery for damages

allegedly sustained to its barge, MAINE f/k/a JOHN BLAKE ("MAINE"), which

was towed by M/V AMERICAN LADY, owned and operated by defendant Bay

and Ocean Marine Towing, L.L.C. ("B&O")  from Amelia, Louisiana to Santo

Domingo, Dominican Republic, on or about November 24, 2007, through

December 1, 2007.[1]  Rec. Doc. 1.  B&O counterclaimed for fees and costs under

---

[1]Although Black Stallion named the M/V AMERICAN LADY as a defendant *in rem* in its complaint, and although that vessel is identified as a party in the pre-trial order, the record does not reflect that the vessel was ever seized or that this Court has *in rem* jurisdiction over it.

the towage contract between the parties. Rec. Doc. 22. Black Stallion amended its complaint to add B&O's insurer, One Beacon Insurance Company ("One Beacon"). Rec. Doc. 72. One Beacon brought a third-party claim against International Energy Trading, Inc. ("International Energy"), which though its president and owner John Anderson ("Anderson"), was involved in the sale of the MAINE to Black Stallion.[2] Rec. Doc. 74. One Beacon tendered International Energy to the plaintiff under Fed. R. Civ. P. 14( c) and International Energy answered Black Stallion's complaints; however, the pre-trial order entered in this matter does not reflect that Black Stallion asserted any claims directly against International Energy. Rec. Docs. 124-25, 141.

At trial, the testimony of most of the witnesses was presented by deposition including Anderson, Berthney N. Barrois ("Barrois"), who was president & 100 % owner of Block One Marine, Inc. ("Block One") and employed by B&O at all relevant times. Rec. Docs. 161-162. The testimony of marine surveyors Perry H. Beebe ("Beebe") and Geoffrey Webster ("Webster") was presented by deposition,

Rec. Doc. 141.

[2]The Court dismissed One Beacon's third party complaint against International Register of Shipping on motion for summary judgment before trial. Rec. Doc. 135. One Beacon's companion declaratory action was settled shortly thereafter. Rec. Doc. 143.

along with the testimony of Joseph Deon, Jr. ("Deon"), captain of the AMERICAN

LADY, and the two crewmembers, tankermen/engineer, Shamus Michael Dardeau

("Dardeau") and tankerman Joseph Elie Trahan Jr. ("Trahan").  Rec. Docs. 156-

160. Gabriel Staffeld ("Staffeld"), the general manager of Black Stallion testified

at trial, as did naval architect Arthur Darden ("Darden").[3]

    Many of the background facts are not contested.  Black Stallion's business

includes the storage and distribution of asphalt in the Dominican Republic.   Its

principal is Raul Lluberes ("Lluberes"), who controls Inversiones Titanio S.A.

("Inversiones Titanio"), the larger group of companies of which Black Stallion is a

part.  In November 2007, Lluberes contacted Anderson in immediate need of a

barge to purchase in order to fulfill an asphalt storage contract recently awarded by

the government of the Dominican Republic with an anticipated shipment of asphalt

due to arrive at the end of November.   Anderson and International Energy Trading

have a specialty in the asphalt trade and had previously represented Lluberes with

regard to the purchase of another barge for use with asphalt in 2004. That barge,

---

[3]Although B & O and One Beacon submitted deposition designations in compliance with the Court's order, the record also reflects that Black Stallion submitted the depositions in full at trial.  Rec. Doc. 140, 155, 155-162, 163 at 138-39.  It is also unclear from the record whether all designations were properly "highlighted."  Therefore, the Court has considered the deposition testimony in full.

the BLACK BEAUTY f/k/a CHESAPEAKE ("BLACK BEAUTY"), had been successfully towed from the United States to the Dominican Republic by Barrios and/or his company.  In 2007, after being contacted by Lluberes and Anderson of the immediate need for a barge, Barrois advised Anderson of the MAINE'S availability.  After various communications,  Barrois arranged for his company, Block One, to purchase the MAINE from its owners for $700,000 on November 15, 2007.  Exh. 14.   Barrois signed the bill of sale from Block One to Black Stallion dated November 15, 2007, but the bill was not notarized until December 12, 2007.  Exhs. 8-9.  Barrois immediately sold the MAINE to Black Stallion for $875,000.  Exh. 1.  At the same time, Black Stallion signed an agreement for the towage of MAINE with B&O for $300,000, and also contracted to pay $30,000 for B&O to arrange for various clearances and certifications needed for the towage. Rec. Docs.  2, 9.

The voyage commenced in Amelia, Louisiana and the Eugene Island sea buoy on November 24, 2007, with two tankermen riding the MAINE.  When the MAINE arrived off of the shores of Santo Domingo on December 1, 2007, two holes approximately 30' by 4' were found in the #1 port and starboard tanks, along with a large puncture in the #5 port tank bottom.

## <u>LIABILITY</u>

**Purchase and sale of the MAINE**

Most of the details pertaining to the purchase and sale of the MAINE are also uncontroverted. According to Anderson's deposition testimony, International Energy "assist[s] in the purchase, transportation, terminaling and distribution of black oil products, primarily asphalt and fuel oils." Rec. Doc. 162 at 7. Anderson has been in business ten years and had been doing business with Lluberes and Inversiones Titanio as a paid consultant since 2004, assisting with the purchase and transportation of several shipments of asphalt to the Dominican Republic and the purchase of the BLACK BEAUTY. *Id.* at 13-14. Anderson also had worked with Barrois and his company with regard to the towage of the BLACK BEAUTY in 2004, as well as with regard to the towage of the HOLLYWOOD for another client in 2002 or 2003. *Id.* at 15. The barges were older barges, intended for stationary permanent waterborne storage. *Id.* at 21.

Anderson testified in deposition that in 2007, after contacting ship brokers, he contacted Barrois about towage, was informed that Barrois might know of a suitable barge for sale, received details from Barrois and got approval to proceed from Lluberes. *Id.* at 26, 28. Anderson also testified that he knew the barge was

out of class with no current loadline, and had discussions with Barrois about the barge's lack of certifications and what it required, "and the feeling was, according to Mr. Bert's expertise, that since we were taking it out of service in the United States, taking it offshore never to return, that it was going to be floating storage, that we would not have any difficulty in being able to get whatever trip permits or transit permits necessary...." *Id.* at 29, 32. "We were referred back to a survey that Mr. Barrois was having done that would verify its ability to perform what we requested that it needed to be done. And we were going on the verbal assurances from Mr. Barrois that it would, in fact, function well as floating storage." *Id.* at 32. Anderson was not concerned that the barge was out of class with regard to her capacity to serve as a storage barge. *Id.* at 34. Barrois had read portions of a prior survey of the barge to Anderson, but unlike the barges in his previous transactions, Anderson testified that neither he nor his people had seen the barge before it sailed. *Id.* at 35-37. "We had several years of experience and relationship with Mr. Barrois. Had all the confidence in his capabilities and therefore because of the time and our relationship, we relied on him." *Id.* at 37.

According to Anderson, Barrois recommended that the barge be reflagged to avoid time and cost attendant to dry docking and obtaining Coast Guard approval.

No one from Black Stallion saw the barge prior to the purchase "as is, where is."

*Id.* at 138.  Anderson testified that he received a consulting fee from Black Stallion

paid from the sale and transport of asphalt.[4]  *Id.* at 131.

Anderson also testified as to his understanding of Barrois' responsibilities

with regard to the barge: Barrois was responsible for securing the loadline

certificate and reflagging the vessel.  Anderson admitted that he did not request a

trip in tow survey, but that it was Barrois' responsibility, that Anderson normally

requires a trip in tow survey from the tower and that "we didn't feel the need for

that since it was an empty vessel." *Id.* at 49.  Anderson acknowledged that the

purpose of the trip in tow survey is to determine the vessel's suitability for making

the voyage.  *Id.* at 50-51.

Staffeld is the nephew of Lluberes.  His trial testimony with regard to the

purchase of the barge did not contradict Anderson's deposition testimony in any

material respect.  He confirmed that Black Stallion was not looking for an ocean-

going vessel when it bought the barge.  Rec. Doc. 163 at 8.  He identified

Anderson as a consultant and that it was Anderson who both recommended Barrois

---

[4]The Court notes that there is a dispute as to how Anderson received the $75,000 fee
pertaining to the purchase and sale of the MAINE.  The Court finds that it is not material to the
issues involved in this dispute, however.

and dealt with Barrois on behalf of Black Stallion.  *Id.* at 8-9.  He described the

missions of Anderson and Barrois as the same: to "[g]et us a barge that would be

fully operational and capable of doing what we needed for that contract," and

stated that he understood that the barge would be in "a good enough condition to

be towed down to the Dominican Republic" and that he would not have bought the

barge if it was not in that condition.  *Id.* at 10, 14.

Staffeld testified that he relied on Anderson's email advice that his surveyor

said the barge was "all in tact."  *Id.* at 41; Exh. 6.   He also testified that he thought

Barrois was an expert in towage.  *Id.* at 15.  "We really relied on Mr. Anderson and

Mr. Barrois.  We didn't even think about inspecting it."  *Id.* at 44.  He also

acknowledged that a true inspection would require more time than that available to

Black Stallion.  *Id.* at 45.  Staffeld confirmed the payments to Barrois and testified

that he did not pay Anderson a fee for his role in the purchase of the barge.  *Id.* at

10.

The testimony of Barrois was presented by deposition.    His testimony

confirms his expertise in towing: he has been buying and selling marine equipment

for nearly twenty years, he followed his father in the tug boat business and that

Barrois has been in the boat business himself since 1967, when he built a forty foot

crewboat.  Rec. Doc. 161 at 10, 13, 14.  In the 1980's, Barrois was involved in buying and selling various types of vessels, tugs, barges, cranes, crewboats, and handled flagging issues and certifications, and understood that a classification society certifies the seaworthiness of a vessel, its design, watertight integrity.  *Id.* at 15-16.

Barrois testified that his professional relationship with Anderson began approximately six years before the MAINE: "it was all towing, moving barges from point A to point B.  The first barge was the Hollywood.  It was an inland tank barge, and we took that barge from Harvey to South America and delivered it there."  *Id.* at 20.  When asked about problems with the trip involving the HOLLYWOOD, Barrois stated, "Well, of course, yes.  I mean, you always have little problems here and there.   It was an inland tank barge and they had got a provisional loadline on it for the trip....And, of course, being an inland barge we – well, not we.  He had rigged it up with towing eyes and different things, but I don't think he strapped them the middle so they had some cracking problems."  Barrois' knowledge of problems towing inland barges was reflected in his testimony that after the HOLLYWOOD was repaired in Tampa, it was towed to the Dominican Republic, where it had "a couple of cracks upon arrival down there."  *Id.*

Barrios testified that his next dealing with Anderson involved the BLACK BEAUTY, an ocean going asphalt barge located by Anderson and inspected and surveyed for Anderson by Barrois, who also assisted in the sale negotiations and reflagged and prepared the barge for towage to the Dominican Republic. *Id.* at 22-23. He also testified that he knew that the Coast Guard has become very strict about inland barges that are not designed nor seaworthy to make an ocean trip; when the HOLLYWOOD was towed, the Coast Guard required only a clearance out of the country. *Id.* at 24-25. Barrois considered his first two transactions with Anderson to have been good experiences. *Id.* at 26.

With regard to the MAINE, Barrois confirmed that Anderson was an expert in asphalt and always looking for equipment. *Id.* at 27-30. Barrois discovered the barge in February/March, 2007, called Anderson about it, and when Anderson was in the area, he stopped by to walk the barge in Morgan City, but did not express an interest in the barge at the time. *Id.* When Anderson later contacted Barrois in need of a barge, Barrois again sent the barge specifications he had initially provided Anderson as part of his "sales pitch." *Id.*

Barrois admitted that he thought the barge's provisional loadline when it was transported from New York to Morgan City could be used for transport to the

Dominican Republic, but later found that a new loadline was required, which prompted Anderson and Barrois to decide to reflag the vessel in order to avoid complications and expenses. *Id.* at 31. The identity of the seller was not disclosed to Black Stallion or Anderson "[b]ecause I wouldn't want to tell him where to go buy the barge. That would be...that wouldn't make sense. Good business sense." *Id.* at 32. Barrois reviewed information that included a survey dated December 2006, a trip in tow survey dated January 2007 for the New York/Louisiana tow and a survey dated July 2007 regarding plate thickness. *Id.* at 33-35; Exhs. 10, 11, 12.

Barrois confirmed that the purchase of the Maine was a "back to back sale" and that the purchase price was negotiated from the asking price over $1 million. He claimed he could not remember how much he paid for the barge, but remembered Block One immediately sold it to Black Stallion for $875,000. *Id.* at 43-52. He testified that Anderson made $75,000 from the sale of the MAINE, paid to his consulting firm by Block One. *Id.* at 115, 120.

Barrois testified that after the sale, he went to the barge in Morgan City "just to look at some things for my own peace of mind." *Id.* at 55-56. Barrois also testified that Anderson "ordered" the November 20, 2007, "condition and valuation" survey report by Beebe , that such surveys are normally done for

insurance purposes, and that Beebe assessed the value at $1.2 million.  *Id.* at 61-63; Exh. 27.

Barrois confirmed the $30,000 invoice from Bay & Ocean for clearance fees, custom fees, immigration fees, provisional loadline certificate, deregistration of the vessel, and that his son arranged for the survey from International Register of Shipping ("IROS") through Sierra Leone in order to get the provisional loadline. *Id.* at 86.  Barrois testified he met the surveyor, who requested drawings and engineering calculations, and  was "kind of amazed at the way the process went" because, in his experience, "it's always already done or the client takes care of that...." *Id.*   When asked if Anderson undertook the responsibility to assure that the barge was "seaworthy to make the trip," Barrois testified "I don't think he has the knowledge of towing, that's why he hired me." *Id.* at 135.

With regard to the purchase and sale of the MAINE, the Court finds that all of the credible evidence establishes that Barrois enthusiastically orchestrated all aspects of the purchase and sale of the MAINE, presented himself to all involved as an expert in towing and barges, and affirmatively sought to have Anderson and Black Stallion rely on his advice and opinion.

**Pre-Voyage Condition of the MAINE**

After the MAINE was towed by tugs from Amelia to a sea buoy off the coast of Louisiana, it was towed to the Dominican Republic by the tug AMERICAN LADY, owned and operated by B&O.  Three of the crewmembers assigned to that voyage testified by deposition.  The first, Dardeau, was freelancing and worked as a tankerman/engineer only once for B&O on the November, 2007 tow, which was his first ride on a barge.  Rec. Doc. 157 at 7, 20.  He was on the barge in Amelia four or five days before the trip started and did not think the barge was unsafe, although he did not look into the tanks; he also testified that the short trip to the sea buoy was "smooth."  *Id.* at 12-13, 19.   Dardeau recalled that a surveyor had been on board a few days before the trip and "he actually crawled down in the tanks." *Id.* at 15.  Dardeau testified that he walked around the barge many times on a daily basis and that there were no 30' by 4' holes in the hull in Amelia, and that they checked the barge for holes before they left.  *Id.* at 20.

According to his deposition testimony, tankerman Trahan had more barge experience than Dardeau and was on board with relatives; his father was on the tug and the captain was his cousin.  Rec. Doc. 157 at 10, 12.  Trahan's testimony echoed Dardeau's in that he did not feel the barge was unsafe, and did not see any holes in the tank before the voyage started, and certainly would have noticed two

large gashes in the hull.  *Id.* at 13, 18.

Captain Deon testified in his deposition that he had worked for B&O for eight months on an interim basis when he undertook this tow.  Rec. Doc. 158 at 8-12.  He testified that previously he had made five or six trips on the AMERICAN LADY and that he checked out the barge when the tug arrived at the sea buoy.  *Id.* at 28-31.  Not only did he feel that the barge was in a condition good enough to be towed to the Dominican Republic, but he also confirmed the barge's condition with one of the captains of the barge that brought the barge to sea.  *Id.* at 33-38.

According to Beebe's deposition, he has been a marine surveyor for 25 years.  Rec. Doc. 160 at 7-8.  Beebe testified that he was contacted by Barrois and retained by Block One to survey the MAINE.  *Id.* at 12-13.  Beebe knew that Barrois intended to tow the barge south and wanted a "condition and value survey," which Beebe assumed was for use with insurance or a bank loan "[j]ust to get a market appraisal of the condition and the value of the barge."  *Id.* at 20. Beebe knew the barge was not "in class," or Coast Guard inspected or certified.  *Id.* at 22-23.

According to Beebe, he surveyed the barge in Amelia, Louisiana.  He took photos externally and walked around, probably opened hatch covers, but did not go

inside any tanks because the barge was not gas-free and he was not doing an internal inspection. *Id.* at 26-27, 35. He noted no significant damage, but his information that the bottom coating was in good condition came from Barrois. *Id.* at 31-36. His survey included a disclaimer that "[n]o determination of structural integrity or inherent stability has been made and no opinion is expressed in that regard," and he recommended that the crew obtain a weather forecast prior to voyage and an ultrasound thickness survey of the hull plating. *Id.* at 29-30, 37, 40; Exh. 20. Beebe opined only that the barge was fit for its intended purpose, not that it was seaworthy or suitable to be towed in open water. Rec. Doc. 160 at 38-39. His valuations of $1.2 million/$7.436 million replacement cost were based on the barge market at the time, although he would have lowered the value had he known that the barge was recently bought and sold for $700,000 and $875,000, respectively. *Id.* at 48-49.

Barrois' repeatedly confirmed in his deposition testimony that the MAINE was in a condition that to make the trip to the Dominican Republic safely. He stated that he looked at the towing gear "and everything seemed to be in good shape." Rec. Doc.161 at 89-91. He did not recall any holes in the #1 starboard or port side, nor the # 5 port. *Id.* He hired a tankerman, "and he and I went through it

because I don't know nothing about tank barges and he checked all, made sure all the valves were shut and working properly and the generators were working." *Id.* When asked if anyone on the crew or any surveyor doubted that the vessel should be towed from the United States to the Dominican Republic, Barrois answered, "No, no one. No one." *Id.* In fact, despite the damage sustained by the MAINE, Barrois continued to hold the opinion that the barge was suitable for the trip: "No, I didn't have a problem with it. It's a very, very good barge I thought." *Id.*

Black Stallion agreed to the following it its towage agreement with B&O:

8.) Charterer shall load, secure, unload, fit out, and maintain the Tow for the towage in a manner in all respects proper seaworthy, and sufficient, and Charterer shall hold harmless, indemnify, and defend any way contributed to by the un-seaworthiness [sic] of the Tow or by any deficiency of [sic] failure of the Tow's equipment or personnel.[5]

Exh. 9 at 4.

The Court finds that all of the credible evidence indicates that the MAINE was "in all respects proper seaworthy, and sufficient," in good condition without defect prior to the voyage at issue, despite the lack of dry docking prior to the voyage. The Court notes that much of the evidence about the condition of the

_____

[5]Although not relevant in light of the Court's findings, the Court notes that grammatical mistakes render much of this clause incomprehensible.

MAINE came from Barrois himself and to serve his own self-interest in securing the purchase, sale and towage contracts. The Court also credits Beebe's testimony that it was Barrois who provided information that the bottom coating was in good condition. Rec. Doc. 160 at 34. The record remains devoid of evidence that would support a finding that the barge was not seaworthy or suitable for towage. In so finding, the Court rejects as unsupported by the evidence the defenses raised by B&O that the MAINE was not sufficiently seaworthy to withstand the ordinary perils to be encountered.

In addition, Barrois' mark is all over the testimony regarding the lack of hull insurance for the MAINE, and reinforces the Court's finding that Barrois was dominating with his involvement and affirmative representations regarding the condition of the MAINE. Anderson testified in his deposition that hull insurance was not procured on behalf of Black Stallion because, "[w]e were instructed by Mr. Barrois that his insurance would cover the barge in transit." Rec. Doc. 162 at 45. "According to our tow agreement with Mr. Barrois we felt it was not necessary because we were instructed that his insurance covered the towage." *Id.* at 45-46. Anderson testified that Barrois forwarded his insurance policy to him; "everything appeared to be in order, therefore we accepted it" and forwarded it to the plaintiff.

*Id.* "According to the conversation we had with Barrois he assured us that his tower's policies extended to the barge and that that was part of his contractual liability and obligation, and that we would be covered accordingly." *Id.* at 140. In telephone conversations, "[o]ur question and his response was, are we covered by your insurance? And the statement was yes." *Id.* at 142. At trial, Staffeld testified that the vessel was not insured by Black Stallion at the time of purchase "[b]ecause we understood that Mr. Barrois had the insurance for the barge." Rec. Doc. 164 at 14.

Barrois testified by deposition that Paul Fernandez ("Fernandez"), his insurance contact for 25 years, handled the insurance on the AMERICAN LADY and this voyage, but that he did not review the coverage at that time. Rec. Doc. 161 at 17-18, 39-41. He testified that the only thing he discussed with respect to insurance was the deductibles, hull coverage, P & I coverage: "I don't tell him I need insurance to move a barge from here to here....He knows that already. That's why I hire him. He makes big bucks." *Id.* at 42.

Barrois' sworn recollection of conversations with Anderson is problematic to the Court and substantially detracts from his credibilty. Barrois testified, "[o]ther than we issued a certificate of insurance to Black Stallion... I know – I

know we wouldn't have said we insured the vessel for sure." *Id.* at 76. Barrois testified that this followed standard procedure in the towing business. *Id.* Barrois understood that the P&I coverage would cover any damage "we" sustained in the tow. *Id.* at 77. Although Barrois testified that he thought he requested a certificate of insurance for Black Stallion prior to the commencement of the trip, a post-voyage certificate of insurance dated December 3, 2007, was forwarded by Fernandez to Black Stallion. Rec. Doc. 162 at 99-100; Exh. 38.

At the same time, Barrois also testified in deposition that prior to the trip he "may have talked" to Fernandez "about if it was possible for him to insure it, the barge for the client, which we do that quite often," but "I don't think anything was done that I can recall." *Id.* at 77-78. Barrois also testified "most probably" Anderson requested "it, for me to look into it. Yeah, I think that's what he did," but that "[i]t didn't go anywhere," and that he did not know why. *Id.* Barrois testified that contrary to Anderson's testimony, Barrois never guaranteed insurance coverage for the barge, that he never told Anderson his insurance would cover the barge, regardless of its ownership, and suggested that Anderson "might have misunderstood what kind of insurance we cover." *Id.* at 118-19. The Court finds that Anderson's account is credible and Barrois' account affected by his self-

interest in avoiding responsibility.

**Fault**

The fact that the MAINE arrived in the Dominican Republic with serious damage to its hull is undisputed. The cause of that damage is the focus of the dispute at trial. The parties agree that B&O owed a duty during the voyage to tow the barge using reasonable care and skill "as prudent navigators employ for the performance of similar service." *Consolidated Grain & Barge Co. v. Marcona Conveyor Corp.*, 716 F.2d 10787, 1081 (5th Cir. 1983); Rec. Docs. 146 at 2, 173 at 16. In this matter, two expert witnesses testified that the negligence of B&O caused the damage sustained by the barge; B&O presented no expert testimony on the issue. Testimony from the crewmembers, Anderson and Barrois also bear on the issue of fault.

Webster was engaged by IROS as an expert marine surveyor to testify about the inspection and survey of the MAINE relative to the provisional loadline survey performed by Sunil Kumar ("Kumar") on November 22, 2007. Exh. 27, 28. Although IROS was dismissed from suit, Webster's deposition was offered by the parties in lieu of trial testimony. He claimed expertise in marine engineering, naval architecture, marine surveying and wind and wave conditions, although he

has never been qualified as an expert in towing.   Rec. Doc. 159 at 7-11.  Webster

testified that the surveyor issuing the loadline certificate is opining that the vessel

is seaworthy and in a reasonable condition to be towed, and that Barrois was

present during the survey.  *Id.* at 29-30, 32.

According to his deposition testimony, Webster constructed a spreadsheet

including data concerning speed, wind and wave heights, the condition of the

MAINE on arrival and concluded that the damage was caused by the tow.  *Id.* at 7.

Webster also testified that an internal survey was not required for an interim

certificate based on the facts available about the barge, *Id.* at 40.  "He's [Kumar]

talked to the people who bought the barge.  Mr. Barrois said himself he thought the

barge was a good barge.  His tug boat guy did.   They all climbed on the barge.  If

they thought it was a piece of junk they wouldn't have towed it." *Id.* at 98-99.

Webster did state that the tower should have taken a coastal route to the

Dominican Republic, and noted that he has issued many trip-in-tow surveys for

vessel owners in order to ensure that the proposed route is safe.  *Id.* at 43-44.

Webster also opined that even though the MAINE was not an ocean going barge, it

was "structurally sound and fit for the voyage" and  could have made the trip

without incident if it has been towed along the coast, avoiding high wind and

waves, and that its earlier trip in tow survey had set a maximum of six to eight foot waves for the trip to Louisiana.[6]  Rec. Doc. 159 at 90-93; Exhs.11, 49 at 6. Webster further opined that because everyone involved was aware of the barge's inland status, a trip in tow survey should have been done.  Rec. Doc. 159 at 104.

Webster testified that the barge was damaged because of inappropriate actions of the tower, B&O "for not following the requirements of a trip in tow survey" that would have given the captain instructions not to sail in heavy weather, not go too fast, "and to make sure they did not overstress the hull of the barge." *Id.* at 84-85.  "The tug boat was traveling too fast for high sea conditions up to and above 12 feet, which caused severe pounding and slamming to the hull of the barge which was lightship with only a light draft of 2 feet forward and 2 and half feet aft. This action by the waves caused the bottom plating to fracture and break loose." *Id.* at 86.  His opinion relied on an email from Anderson dated November 11, 2007, that "[i]n fact, they were fighting 10 foot seas so they had to slow down." *Id.* at 86-87; Exh. 6.  He also relied on log entries indicating heavy seas and high speeds; "....they were going too fast in this type of sea condition."  Rec. Doc. 159 at 87-88;

_____

[6]Webster testified both that it was the obligation of the tower, B&O, to arrange for a trip and tow survey and approve this tow, and that it was the responsibility of Black Stallion as owner to arrange for a trip in tow survey.  Rec. Doc. 159 at 119-20, 131.  In any event, B&O alone set the course taken.

Exhs. 36-38.  He opined that the fatigue causing the damage began early in the voyage, in eight to ten foot seas.  *Id.* at 107.

Webster opined that the plates on the barge were fractured because of the pounding and slamming and being towed too fast in high seas.  Rec. Doc. 159 at 94, 96-97; Exh. 49.   He acknowledged that his opinion on this specific regard differs from the opinion given by Darden, who had been engaged by Black Stallion, who stated that the weld butts and seams were "probably extremely corroded."  Rec. Doc. 159 at 100-01. Webster noted the lack of record evidence supporting Darden's statement.  *Id.*   Webster testified, however, that several of the surveyors and Barrois saw the bow and the stern prior to the voyage, along with an empty  compartment, which "gives a good indication of what the condition of the hull is."  *Id.*

Darden was engaged by Black Stallion as expert naval architect and testified live at trial.  Rec. Doc. 163 at 97; Exh. 64.  He noted that the MAINE had been towed to Louisiana earlier in 2007 with a trip in tow survey, which placed limits on the route used, and that a July 2007 survey indicated that "the vessel overall appeared to be in relatively fair condition ... subject to the exceptions which he sets forth." Rec. Doc. 163 at 103, Exh. 11.

Darden provided four opinions pertaining to the cause of the damage to the MAINE, similar in several ways to Webster's. His first opinion was that the MAINE was damaged because it encountered sea conditions that caused flexing and pounding on the hull. Rec. Doc. 163 at 106-07; Exh. 64 at 5. His second opinion was that the towing company should have known that the route taken across the open Gulf was not suitable for this barge. Rec. Doc. 163 at 110-12; Exh. 64 at 5. Darden's third opinion was that the weld butts and seams of the barge's bottom plating were "suspect, probably extremely corroded," causing them to fracture during transit with sea conditions that caused the welds to flex and give way on the bottom. Rec. Doc. 163 at 111-12; Exh. 64 at 6. Finally, Darden opined that the loss of the plating affected the barge's performance and should have been noted early in the voyage by the crew, who reported to Anderson an increase in drag approximately eight hours prior to arrival in the Dominican Republic. Rec. Doc. 163 at 113-14; Exh. 64 at 6-7.

> I think it was a combination of several things. I think the internal framing, like I said, were the channels welded to the longitudinal stiffeners, I think those welds broke first. And then the only thing holding the bottom plating with the attached longitudinals are the weld butts and seams. And, eventually, due to the flexing, they're going [sic] let go. And that's when the bottom plate fell out.

Rec. Doc. 163 at 130.

Darden agreed that it would be a "good idea" for a prospective buyer to view a vessel and its internals and bottom before purchase and to get a trip in tow survey. Rec. Doc. 163 at 115-17. He also agreed that it was reasonable for a tower like B&O to rely on a provisional loadline certificate and that he had no criticism with the speed of the AMERICAN LADY. Rec. Doc. 163 at 119, 125-26.

Darden also agreed that a dry dock inspection of the MAINE prior to the voyage would have been prudent on the part of Black Stallion, and that "if the MAINE was in good condition, as opposed to having corroded weld butts and seams," the MAINE "likely" would have made it to the Dominican Republic without the damage. Rec. Doc. 163 at 131. At the same time, Darden admitted that any corrosion damage sustained by the MAINE would not have been apparent to the crew "just by walking around the deck of the barge," assuming the bottom plate was still on. Rec. Doc. 163 at 133. He also agreed that "inland barges are not designed to any sea conditions" because flexing and pounding will cause welds to separate regardless of age or condition, and that the barge would encounter calmer seas and be able to take safe harbor if it is towed on a route that "hug[s] the coastline." Rec. Doc. 163 at 134, 137.

The crewmembers testified in deposition to a largely uneventful trip.

Dardeau stated that the barge was "quite a few hundred feet" behind the tow and that they did encounter six to eight and occasionally ten foot seas that were "a little choppy," but never twenty foot storms, and the barge was light without cargo and had an eighteen foot draft.   Rec. Doc. 157 at 20-21.  Dardeau did testify that he did hear the barge slam.   *Id.* at 22.  He testified that the tanks were opened periodically, and the crew heard progressive venting en route when approaching the Dominican Republic, "[s]o we kind of figured something was wrong but we didn't know because we couldn't really see.   *Id.* at 26-27.  Trahan presented similar testimony that he did not know how high the seas got, that the barge was rolling and sometimes slamming, but that he first noticed something was wrong with the barge when he heard venting.  Rec. Doc. 156 at 19-21.

Deon, the captain of the AMERICAN LADY, testified that he took the route to the Dominican Republic that he had used before with successful tow of the BLACK BEAUTY, which was an ocean going barge.  Rec. Doc. 158 at 22.  He testified that the seas did not get above six to eight foot and that he felt no resistance from the barge.  *Id.* at 48-49, 53.   He stated that on December 1, 2007, some people came out to the tow via helicopter and they heard a noise from the barge which, when a hatch cover was open, revealed the barge was bottomless;

Deon did not see the holes when they began the trip. *Id.* at 57, 59, 64-65, 81. Deon maintained that he did not notice a difference in the tow or excessive pull, while appearing to concede existence of the holes would make it heavier to tow. *Id.* at 75, 81.

Much of the information about the tow received by Anderson and reported to the owners in the Dominican Republic came from Barrois, with the focus on the barge's estimated time of arrival. Rec. Doc. 162 at 95. Anderson reported on November 24, 2007, that the barge was handling six foot seas; on the following days he reported rougher ten foot seas. *Id.* at 95, Exh. 5 at 14. He was on the helicopter that went to the tow as it approached the Dominican Republic, and first became aware that there was problem when he saw through the hatches that the #1 starboard and port bottom plates were gone. Rec. Doc. 162 at 98-100. A similar problem was found in the #5 port tank. *Id.* at 102.

The crewmembers assigned to the barge told Anderson that they did not know what happened until Anderson arrived and that they had spent little time on the barge. *Id.* at 101-02. Anderson's questions to the crewmembers about why they did not investigate the "substantial banging" caused by the obviously protruding" steel were unanswered. *Id.* at 103-04. According to Anderson, Barrois

and Staffeld decided to take the barge to port.  *Id.* at 104.  Anderson testified that he has not been told nor discovered the cause of the damage, but surmises that it sustained a severe impact from below caused the damage "based on the epoxy fracturing and the paint fracturing" and with "the hole being punctured in the middle [of 5-P], it had to have landed or struck something."  *Id.* at 113.

Barrois vouched in his deposition testimony for the experience and competence of the captain and crew of the AMERICAN LADY.  Rec. Doc. 162 at 92-101.  Barrois testified that he first heard of a problem with the tow when he flew to the Dominican Republic to meet the vessel and Anderson.  *Id.* at 102-03. He immediately arranged to call the insurer, and was advised by the captains that they never felt anything hit and that the weather was "pretty smooth."  Rec. Doc. 161 at 105.  When asked about the steps taken to determine if it was safe to make the trip in light of the fact that the MAINE was an inland barge, Barrois testified that he relied on the provisional loadline certificate, which "deemed the barge seaworthy."  *Id.* at 112.

At the same time, Barrois testified that he did not necessarily rely on the January 2007 trip in tow survey, which required the tow to hug the shoreline so that in the event of bad weather the barge could seek shelter.  He considered that

first ocean tow "greater than the one I was getting ready to. ... I had a shorter tow in better weather."  Rec. Doc. 161 at 37, 38.

The Court finds by a preponderance of the evidence that B&O failed to exercise the requisite due care under the circumstances, and that this negligence caused the damage to the MAINE.  Specifically, the Court finds that the damage sustained by the MAINE was caused by sea conditions attendant to the route chosen by B&O across the Gulf, and that this barge would have made the journey satisfactorily had B&O chosen a coastal route with limitations similar to those imposed in the January 2007 trip in tow survey.   Although a trip in tow survey may have avoided the damage had it been followed, a trip in tow survey was against Barrois' interests and Barrois actually testified that he had determined that B&O did not need to follow the restrictions placed on the MAINE in the January 2007 trip in tow survey.  A tower should act prudently with or without a trip in tow survey.

In addition to the knowledge of the January 2007 trip in tow survey restrictions on the MAINE,  B&O had encountered problems with a previous tow that resulted in damages to the HOLLYWOOD, another inland barge.  According to Deon, he used the same route to the Dominican Republic for the towage of the

MAINE as he did for the ocean-going BLACK BEAUTY.

In this regard, there is no dispute that Barrois knew far more about the barge than Black Stallion did, and "hustled" Black Stallion to buy it by vouching for it in so many respects. His proclaimed knowledge of towing and barges undermines the case for B&O in other respects as well.

Barrois testified to his understanding of the ocean-going limitations imposed by the Coast Guard on inland barges attendant to their structure and purpose. He knew that the barge had not been in dry dock for over three years and that the actual condition of the hull was not known. Therefore, the B&O crew should have been instructed to use extra precautions in the towage and route taken.

The Court finds the testimony of the B&O crewmembers on the issue of causation is problematic as well. The evidence supports the finding that Dardeau and Trahan, the two men who were supposed to be on the barge and attending to it, did not spend sufficient time on the barge, a finding that, in turn, explains why the initial damage to the MAINE was not immediately noticed and why the AMERICAN LADY continued to tow the MAINE after damage was sustained, arguably compounding the damage. The Court is also extremely disturbed with the unexplained lack of production and/or disappearance of the hard log with

handwritten entries for this trip; the omission of this evidence does not lend itself to support B&O's arguments that other fault caused the damage to the MAINE.

The Court assigns no fault to International Energy. Although there was a Fed. R. Civ. P. 14( c) tender to Black Stallion, it is unclear to the Court whether the plaintiff is making a claim against it, and in any event, the Court finds that the evidence does not preponderate in favor of a finding of fault. Rec. Docs. 74 at ¶ 9; 124. Although the Court finds that Anderson could have been more thorough in verifying the information he provided Staffeld and Black Stallion, that information emanated from Barrois, who was the man-on-the-spot. Staffeld was aware and/or should have been aware both that Barrois was the source of the information and that the information was being hastily gathered because of the time constraints attendant to the imminent delivery of the asphalt in the Dominican Republic and that he could contact Barrois directly. Black Stallion knew that Anderson is an expert in asphalt, and there is no evidence that anyone affiliated with Black Stallion thought Anderson had any expertise in towage and barges.

Finally, while noting Darden's opinion that the welds butts and seams were "suspect, probably extremely corroded" is candid and perhaps contrary to the plaintiff's claim that the MAINE was sound when the trip began, the Court rejects

that opinion as speculative, without support in the evidence and contrary to the record evidence that the barge was in sound condition in Amelia.

The Court finds by a preponderance of the evidence that B&O is solely at fault for its negligent towage of the MAINE, and that this negligence is the legal cause of damage to the MAINE.

## DAMAGES

Staffeld testified at trial that after the barge was put in dry dock in the Dominican Republic, Black Stallion received an estimate for repairs in November 2008 totaling $1,238,879.70 and that the company could not afford to go forward with the repairs without insurance monies. Rec. Doc. 163 at 23; Exh. 69. According to Staffeld, only part of the MAINE could be used as storage for the asphalt and another barge was time-chartered and towed from New Jersey to the Dominican Republic to meet the contract obligations; that barge was eventually bought by Black Stallion in 2009 for $2 million. Rec. Doc. 163 at 27-28, 32, 76; 90; Exhs. 65, 67. Staffeld admitted that he had "plenty of offers" to buy the MAINE in the four years prior to trial, and that the MAINE eventually was sold for $525,000. Rec. Doc. 163 at 49, 84. Black Stallion seeks the recovery of wharfage expenses, costs of repairs, the replacement barge, along with incidental expenses

including insurance and a diver's report.  Rec. Doc. 163 at 30.

The first legal issue concerns whether the MAINE was a "constructive total loss" because its repair costs exceeded the market value of the vessel immediately prior to the casualty.  *Gaines Towing & Transportation, Inc. v. Atlantia Tanker Corp.*, 191 F.3d 633, 635 (5th Cir. 1999).   The Court previously ruled on motion for summary judgment that it was, but that the market value of the MAINE remained disputed.  Rec. Doc. 128.  "In such a case repair is not economically practicable, and the market value of the vessel is the ceiling of recovery."  *Gaines*, 191 F.3d at 635.  "Damages for loss of use may not be awarded when the vessel is a constructive total loss."  *Id.*  The greater issue here is the market value of the MAINE.

B&O argues that the market value of the MAINE was greater than the $875,000 that Black Stallion paid for the barge.  Rec. Doc. 173 at 26.  Black Stallion argues that the $875,000 purchase price it paid for the barge in Louisiana should not control and should be replaced by a more amorphous but greater market value of the vessel in the Dominican Republic, based on *In re Complaint of*

*Seabulk Offshore, Ltd.,* 212 F.Supp2d 696 (S.D. 2002).[7]  Rec. Doc. 146 at 18. The Court has a number of problems with Black Stallion's argument.

First, it is arguable that the value of the barge in Louisiana is $700,000, the price paid by B&O in Louisiana in this back-to-back transaction; that price is arguably the price Black Stallion would have paid for the barge in Louisiana had it been present in Louisiana and had it not resorted to the use of handsomely-paid intermediaries.   The additional $175,000 in fees arguably represents the Dominican Republic "value added" to the barge.    The record fact that the barge was sold by the plaintiff for $525,000 in the Dominican Republic in damaged condition supports the finding that the appropriate market value is less than claimed by the plaintiff if the destination is determinative.  In this regard, the Court disregards the opinion of value given by Beebe, who was unaware of the relevant purchase and sale prices of the MAINE and who testified that his opinion would have been lower had he been provided with that extremely material information.

The Court finds by a preponderance of the evidence that the market value of the MAINE is $875,000, the purchase price established days before the tow

---

[7]The Court is somewhat confused by the plaintiff's reliance on *O'Brien*.  If the measure of damages is the value of the vessel at the time and place of the loss, the record evidence here indicates that value to be measured in the Gulf *en route* to the Dominican Republic.

commenced and the damage sustained by the barge.  In this regard, there is no

genuine dispute that the repair cost estimate of $1,238,879.70, is reasonable for

present purposes.  There is no dispute that any award is subject to offset by salvage

value plus interest thereon.

The plaintiff also claims consequential damages.  In a clause in its towage

contract with B&O:

> 19.)   Neither Tower, the Tug its Master, crew, nor their respective
> underwriters shall be responsible to the Charterer, the Tow its cargo
> and/or their underwriters for any incidental, special or consequential
> damages, specifically including, but not limited, loss of used [sic]
> and/or loss income, arising out of or in any way connected with the
> performance of this Agreement.

Exh. 9 at 6.  Black Stallion, which relies upon this same agreement as a basis for its

attorney's fees, argues that this clause is unenforceable according to *Bisso v. Inland*

*Waterways Corp.*, 349 U.S. 85 (1955) because "towage contracts are contracts of

adhesion" and "e*xculpatory clauses in towage agreements are invalid, being*

*against public policy.*   Rec. Doc. 146 at 16 (emphasis original).  The Court is

unable to glean such a broad proposition from its careful reading of *Bisso,* which

identified "[t]he question presented is whether a towboat may validly contract

against <u>all</u> liability for its own negligent towage." *Id.* at 85. (Emphasis added).

The Court finds that the contract clause here is not a "release-from-negligence clause" "releasing towers from all liability for their negligence*." Id.* at 90. The clause limits only the categories of damages to which the plaintiff is entitled in the event of damage caused by the negligence of the tower. The Court agrees with the many maritime cases that search for clauses providing "absolute exculpation" before deeming them invalid as adhesion clauses. *See e.g.*, *Dillingham Tug & Barge Corp. v. Collier Carbon & Chemical Corp.*, 707 F.2d 10856 (9th Cir. 1983)(and Fifth Circuit cases cited therein).[8]

In addition, the limitations on recovery set forth in this clause is validated by maritime law concerning limitations on recoverable damages in cases of constructive total loss. *Gaines*, 191 F.3d at 635. Similarly, the Court also rejects the plaintiff's arguments that the multitude of expenses claimed here qualify as "necessary expenses" or "unavoidable costs" occasionally allowed in constructive total losses; again, this case does not involve a sinking, removal of underwater obstruction or an equivalent.

---

[8] At the same time, the Court rejects Black Stallion's reliance on *Dillingham* for recovery of the $330,000 in towing fees. *Dillingham* involved a sinking. Here, Black Stallion received in the Dominican Republic a valuable barge by virtue of the towage, and subsequently sold the barge for a substantial sum. The same rationale underlies the Court's rejection of the plaintiff's claims for the $30,000 in fees it paid to B&O prior to the towage.

In its pre-trial memorandum, Black Stallion claims entitlement to its attorney's fees under its agreement with B&O:

> 21.) This Agreement shall be construed in accordance with the general maritime laws of the United States. To the extent that any party shall retain an attorney to enforce any rights or obligations hereunder then the prevailing party in the dispute shall be entitled to recover reasonable attorney fees, cost, and expenses incurred in connection with same [sic]

Rec. Doc. 146 at 22; Exh. 9 at 6. However, Black Stallion provides no authority to counter the defendants' argument that under the general maritime law of the United States, the obligations sued upon are *ex delicto*, not *ex contractu,* and does not cite to the contract right or obligation on which its claim is based.[9]  *Stevens v. The White City*, 285 U.S. 195 (1932). The Court reluctantly finds that it can not make an award for attorney's fees, costs and expenses under the circumstances.

In addition, Black Stallion seeks an award against One Beacon for statutory penalties, costs and attorney's fees under the Louisiana Direct Action Statute, La.Rev.Stat. §§ 22:1269,[10] 1973 and 1892. Rec. Doc. 146 at 22-23. Black Stallion

[9]In fact, the issue of attorneys fees under the contract is not discussed at all in the plaintiff's post-trial memorandum. Rec. Doc. 167.

[10]Generally, Section 1269 provides a direct action against a liability insurer on policies issued or delivered in Louisiana, Section 1973 provides a insurer's duty of good faith and fair dealing to its insured, along with an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured and/or claimant. Section 1892 provides that insurers make an offer to settle property claims, including a third party claim

does not specify the statutory sections upon which it relies, and otherwise provides a bare-bone argument in its pre-trial memorandum.[11]  *Id.*   Whatever rights the plaintiff has as a third-party claimant under *Theriot v. Midland Risk Insurance Co.*, 694 So.2d 184 (La. 1997), or otherwise, this  record still lacks the evidence to support a finding of the requisite bad faith on the part of One Beacon, or that its action was "arbitrary, capricious or without probable cause."  Instead, the record evidence of the interaction between Black Stallion and One Beacon immediately after the damage was discovered is fairly vague. Whether or not evidence could have been developed to support a finding by a preponderance that One Beacon acted in bad faith by failing to pay a claim arbitrarily, capriciously or without probable clause is irrelevant.   Black Stallion's argument that it is entitled to attorney's fees, costs and expenses under Louisiana law fails for lack of proof.

Finally, the Court takes note of the extent of the failure to mitigate on the part of the Black Stallion, which had managed to find a suitable barge in record speed immediately prior to the arrival of the damaged MAINE in the Dominican

---

within thirty days under certain condition, and provides for penalties in the event "such failure is arbitrary, capricious or without probable cause."

[11]Again, no argument for recovery under these Louisiana statutes is made in the plaintiff's post-trial memorandum.  Rec. Doc. 167.

Republic.[12]  The failure of insurance proceeds from One Beacon may provide an explanation, but not an excuse, for the extensive amounts incurred by Black Stallion after the damage was discovered.

Accordingly,

IT IS ORDERED that judgment be entered in favor of the plaintiff, Black Stallion Enterprises, and against the defendants, Bay & Ocean Marine Towing Company, L.L.C. and One Beacon Insurance Company, in the amount of $350,000, plus pre-judgment interest at the rate of seven (7) percent.[13]  All other claims are DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this 23rd  day of March, 2012

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE

---

[12]This failure to mitigate would have otherwise eliminated many of the items of damages sought by Black Stallion in kind and extent.

[13]The Court finds that this rate falls between the federal and state rates at the time of the loss and is fair and reasonable.